El Pueblo de Puerto Rico, demandante y apelado, *v.* Carlos Manuel Benjamín, acusado y apelante.

No. 4699.—*Sometido:* Noviembre 15, 1932. *Resuelto:* Enero 20, 1933.

---

* Nota: Véase el prefacio.

*Felipe Colón Díaz* y *R. Hernández Matos,* abogados del apelante; *R. A. Gómez, Fiscal,* abogado de *El Pueblo,* apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

Carlos Manuel Benjamín fué acusado como autor de un delito de homicidio involuntario, cometido como sigue:

". . . allá por uno de los días del mes de octubre de 1930 y en el término municipal de Ponce, Puerto Rico, que forma parte del Distrito Judicial del mismo nombre, ilegal y voluntariamente y en ocasión en que manejaba un vehículo de motor, un automóvil, sin estar autorizado para ello, manejó dicho automóvil con tanta negligencia, falta de cuidado y circunspección, que arrolló al ser humano Juana Bautista Ortiz y Candelario, ocasionándole contusiones que fueron la causa ilegal de la muerte de la citada Juana Bautista Ortiz y Candelario.

"La negligencia, descuido y falta de circunspección en este caso consistió en que el acusado guiaba dicho automóvil por el lado izquierdo de la carretera en vez de por su derecha, a una velocidad exagerada."

Hizo la alegación de no culpable y solicitó juicio por jurado. La vista se celebró. Rindió el jurado veredicto de culpabilidad y la corte dictó sentencia imponiendo a Benjamín seis meses de presidio. No conforme interpuso el presente recurso de apelación. Alega como único error la insuficiencia de la prueba. El fiscal de esta Corte Suprema se adhirió al recurso.

No obstante reconocer que la prueba es confusa y difícil de apreciar, opinamos que no puede sostenerse que sea de tal manera deficiente que permita asegurar que el jurado no tuvo base para rendir su veredicto ni la corte para dictar su sentencia.

El primer testigo de cargo que declaró fué Bienvenido Torres.

Dijo que "viniendo de la carretera del Pastillo para acá (Ponce) iba un automóvil; cruzaba una viejita; el automóvil tocó claxon y entonces la viejita cruzó; al la viejita cruzar, el automóvil le dió a un latón que ella llevaba y la viejita cayó al suelo." La carretera "es recta, bastante ancha."

Preguntado sobre cuál era el sitio donde estaba la viejita, contestó: "La viejita está casi para la izquierda; viene ya para del medio de la carretera, y entonces el automóvil tocó, que va por su derecha, y desvió para no pisarla, y entonces le dió al latón y la viejita cayó."

A otras preguntas dijo: "Había carretera para pasar el automóvil. Sí, si se tira parte de la cuneta, pasa. Venía de Peñuelas para Ponce. El carro iba en dirección opuesta. Pues la viejita salía de la derecha, que hay unas casas allí, a cruzar para la izquierda. No le puedo decir (la velocidad) porque yo no entiendo nada de automóvil, pero iba . . . se veía despacio. Como diez o doce varas para alante paró. El muchacho (*chauffeur*) iba por la derecha. Le dió a la viejita más parte para el medio de la carretera. Para la izquierda, para el medio de la carretera. Le dió con el guardalodo de atrás derecho, de aquí para allá, izquierdo, de aquí para allá. El muchacho tocó claxon. La viejita siguió cruzando; no hizo nada, como si hubiera ido a cruzar derecho. Cuando el muchacho se vió frente a la viejita desvió el auto. Para la izquierda. Fué a tener a la cuneta, para alante. Quedó un poco atravesado. La viejita va por el medio de la carretera. El automóvil desvía para la izquierda. Le da con el tapalodos. Con el de la derecha de él. Con el de atrás."

El fiscal presentó entonces una certificación del Comisionado del Interior creditiva de que de acuerdo con los récords de la División de Automóviles de su Departamento, no apa-

recía el acusado autorizado para manejar vehículos de motor por los caminos de Puerto Rico.

Sigue la declaración de Pedro Juan Santiago que no presenció el accidente. Oyó el 6 de octubre de 1930 como a las cinco de la tarde desde su casa gritos, salió a la carretera y vió que habían recogido a Juana Bautista Ortiz que la había golpeado un automóvil. Estaba bañada en sangre. Se brindó a traerla al hospital. La trajo en el auto guiado por el acusado.

Belén Ortiz identificó el cadáver de la viejita. Y el doctor Luis M. Graulau, el 7 de octubre, entre dos y tres de la tarde, practicó su autopsia. Tenía varias contusiones en el cuerpo, una en el dorso de la mano izquierda, otra fuerte en el codo derecho y otra fuerte en la región occipital. Abierto el cráneo había una fractura conminuta. El cráneo estaba destrozado con abundante hemorragia. La contusión se debió a un golpe bien violento. La causa de la muerte fué la fractura del cráneo y la hemorragia de la arteria meníngea media. Tuvo que caer contra algo duro. De lado. Del lado derecho. Tenía como noventa años.

El último testigo del fiscal que declaró fué el sargento de la Policía Insular Víctor Manuel Pizarro. Como a las ocho de la noche del 6 de octubre, 1930, tuvo conocimiento del suceso. El acusado le informó voluntariamente que él era la persona que manejaba el auto. Fué con él al sitio ''y él me enseñó exactamente dónde le había ocurrido el accidente. Dí *reverse* hacia atrás y puse el *switch* de la luz y ví huellas de un automóvil que había manejado momentos antes, en dirección de Ponce para Peñuelas, por el lado izquierdo de la carretera. Medí la distancia con un bastón, la distancia como de donde el automóvil había hecho uso de los frenos, hacia la esquina o muro de la casa de una familia que dice llamarse Cuprill, y en el medio de ese trayecto había unas huellas de sangre. Le pregunté al joven Benjamín que qué era aquello, manifestándome que era la sangre de la anciana con quien él había tenido el accidente. En-

tonces medí y calculé de veinticinco a treinta metros, el sitio donde empezó el automóvil a hacer uso, forzó las gomas hasta la esquina de Cuprill, y las huellas de sangre . . . Personalmente ví . . ¿Estaba el joven allí? Estaba él. Además de usar el *full light* del automóvil, llevaba yo un *flash light* para cerciorarme si aquello era sangre o no era, y del sitio donde estaba la sangre a donde terminó el carro de parar, había, poco más o menos, de quince metros. Estaba la huella de sangre más a la izquierda, en dirección de Ponce para Peñuelas, que a la derecha, siendo ese sitio bastante ancho y carretera recta.''

Terminada la prueba del pueblo el acusado por su abogado solicitó que se le absolviera perentoriamente. El juez oyó su argumentación y declaró sin lugar la moción de *non-suit*.

La prueba de la defensa consistió en las declaraciones de Enrique Chardón, Gerardo Arce y en la del propio acusado.

Chardón dijo:

''Ese día cuando íbamos, salió una señora a buscar agua con un latón, y como quince o veinte metros antes de llegar el carro, él tocó claxon y la señora se atravesó en la carretera. Al llegar al medio de la carretera, que la señora iba entonces a cruzar la carretera, él se echó a la derecha para evitar atrapar la señora, y cuando llegó cinco o seis metros de la señora, viró hacia la izquierda, evitando agolpear a la señora y tropezó con la escalera de casa del señor Cuprill, frente del hipódromo. El carro. La rueda izquierda delantera del carro. Y con la alcantarilla de la casa. Y el tapalodo de la derecha de atrás, le dió a un latón que llevaba la señora. Yo creo que el carro iría de doce a quince millas. Paró como ocho o diez metros.''

Arce manifestó que el carro iba como a quince o veinte millas y tocó claxon. Describe el suceso así:

''Pues resulta que éste (el *chauffeur*) iba por su derecha; entonces la señora iba cruzando de la derecha para la izquierda y entonces él tocó claxon y la señora se turbó y viró para atrás y cuando éste tiró el carro a la izquierda la señora también se tiró a la izquierda, y entonces, cuando el carro iba así, viene y le dió con el guardalodo de-

recho de atrás al latón que ella llevaba; entonces ella cayó y el carro entonces caminó como cinco o seis pies para allá y entonces él lo cogió y lo caminó más, para alinearlo para dejar paso. Sí, señor, se tiró a la escalera de una casa; una casa que había a la izquierda."

El acusado se expresó así:

"Yo sé guiar automóviles hace como tres años. He guiado Hudson, Buick, Chevrolet, Cadillac, Nash y Dodge. Tengo de diez y siete a diez y ocho años. Yendo de aquí para allá, para casa de Enrique Chardón, de Ponce para Peñuelas, frente al hipódromo, salía una viejita y cuando salía la viejita cruzaba de la derecha para la izquierda, y cuando yo la ví salir de la derecha para la izquierda, entonces le toqué claxon y ella se paró en el medio y cuando fuí a coger la derecha, se tiró ella a la derecha, y cuando ví que el carro se la iba a llevar de frente, metí seguida el guía para la izquierda, que por echar, me llevé un muro ahí por defender la vieja; pero el tapalodo derecho del lado de atrás estaba un poco salido para afuera y le dió a una lata que ella traía. Como el carro quedó cruzado, quedó como de ahí a ahí, que tuve que echar para alante para poder dar paso y para que los otros pasaran. El carro paró como ahí, seguida, cruzado, y tuve que echarlo para alante para que los otros carros pudieran pasar porque yo me tiré demasiado a la izquierda y quedó cruzado el carro."

La carretera era recta y suficientemente ancha. La viejita había llegado o estaba próxima a llegar al centro de la misma. Pudo ser vista a tiempo para evitar el accidente. No ya de la prueba del Pueblo, no obstante lo que dijo el primer testigo, si que también de la del propio acusado, puede deducirse que el auto caminaba por la izquierda y tan rápidamente que no pudo detenerse a tiempo o que el acusado guiaba con tal descuido que no advirtió al ser humano que cruzaba la carretera o que habiéndolo advertido fué tan inexperto que no supo evitar el injuriarlo. No se trata de un caso de una persona que aparece súbitamente cuando ya es imposible dejar de chocar con ella.

*Debe confirmarse la sentencia recurrida.*

Los Jueces Asociados Señores Aldrey y Córdova Dávila, disintieron.*

---

* Nota: Véase el prefacio.

OPINIÓN CONCURRENTE DEL JUEZ ASOCIADO SR. WOLF

Nada se dijo en la opinión de la corte de lo cual yo difiriese, pero fué mi deseo aclarar, en cuanto me fuera dable, las razones por las que el jurado tenía derecho a creer que el acusado caminaba por el lado izquierdo de la carretera, yendo de Ponce para Peñuelas.

En este caso se imputó al acusado el haber guiado negligentemente un automóvil, consistiendo principalmente la negligencia, según el Gobierno, en haberlo conducido por el lado izquierdo de la carretera y a mayor velocidad. El acusado ocupó la silla testifical e insistió en que iba guiando por la derecha de la vía pública. Sólo hubo un testigo de cargo que presenció el accidente, y de la transcripción taquigráfica su declaración no es enteramente clara. El acusado iba de Ponce para Peñuelas. El testigo venía en dirección contraria. Aunque a principios del interrogatorio el testigo habló de que el automóvil desvió hacia su derecha, poco después manifestó que el acusado iba por la derecha, lo que según podía inferir el jurado significaba el lado derecho de la carretera desde el punto de vista del testigo como viandante. Dijo además que la interfecta cruzó del lado izquierdo, lo que igualmente significaba la izquierda del testigo, porque lo cierto es que ella cruzó del lado derecho del camino en dirección de Ponce a Peñuelas.

En otras palabras, el hecho claro en este caso es que la interfecta cruzó del lado derecho hacia el izquierdo del camino desde el punto de vista de una persona que se dirigiera de Ponce a Peñuelas y que ella fué arrollada en el lado izquierdo de la carretera. El testigo fué posteriormente preguntado y repreguntado, y es casi imposible expresar exactamenté lo que quería decir cuando en sus respuestas algunas veces decía "derecha" o "izquierda".

Si bien de la mera transcripción taquigráfica el testimonio del testigo presencial a veces es un poco confuso, su declaración indicó que el acusado caminaba por el lado iz-

quierdo de la carretera, yendo de Ponce para Peñuelas. Asimismo al testigo se le pidió que explicara extremos relacionados con la izquierda o la derecha desde el punto de vista de la sala de la corte o del que lo interrogaba, o señalando, y el jurado, mejor que nadie, estaba habilitado para inferir de su modo de contestar, de sus ademanes y su posición, lo que significaban las palabras "izquierda" o "derecha". El juez también oyó la prueba y evidentemente creyó, a juzgar por sus instrucciones, que había evidencia tendente a demostrar que el acusado caminaba por la izquierda de la vía pública. Bajo estas circunstancias, el apelante no me convence de que el jurado no tuviera derecho a concluir por la evidencia que él originalmente conducía su vehículo por el lado izquierdo de la carretera.